**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DANIEL J. GOODSON, III, *et al*, | ) | Civil Action No. 08 - 44 |
| | ) | |
| Plaintiffs, | ) | Judge Gary L. Lancaster |
| | ) | Magistrate Judge Lisa Pupo Lenihan |
| v. | ) | |
| | ) | |
| LAWRENCE O. MAGGI, *et al*., | ) | Doc. No.108 |
| | ) | |
| Defendants. | ) | |
| | ) | |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

I.    **RECOMMENDATION**

The Court respectfully recommends the following:

1.  That the  Motion to Dismiss (Doc. No. 108) filed by Defendants Washington County Commissioners Lawrence O. Maggi, Diana Irey, and J. Brachen Burns, and Washington County controller Michael Namie be granted.

2.  That the Motion to Dismiss (Doc. No. 108) filed by Washington County CYS director Jeffrey Felton and CYS caseworkers Patricia Maxon, Hayley Foster, Patricia Berdine, and Nancy Gray be granted as to the claims against them for declaratory and injunctive relief, and that the claims against them for monetary relief be stayed until the conclusion of the pending state court proceedings.

3.  That the Motion to Dismiss (Doc. No. 108) filed by the Washington County Correctional Facility Warden John Doe be granted except as to Plaintiff Father's First Amendment Free Exercise claim; First Amendment claim regarding denial of outgoing communications; First Amendment claim regarding censorship of legal mail; retaliation claim; and Eighth Amendment claim regarding denial of adequate medical care.

4.  That the Motion to Dismiss (Doc. No. 108) filed by Washington County District Attorney

John Pettit and Deputy District Attorney Michael Lucas, Washington County Sheriff Samuel

Romano, Washington County Prothonotary Phyllis Ranko Matheny and Washington County

Clerk of Courts Barbara Gibbs be granted.

Because Plaintiffs' claims for monetary damages against Washington County Children

and Youth Services must be stayed pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), the Court

also recommends, in the interest of judicial economy, that the claims remaining against

Washington County Correctional Facility be stayed until the conclusion of the pending state court

proceedings.  The case should be administratively closed until that time. It is further

recommended that Counsel for the Washington County Children and Youth Services be ordered

to notify the Court within 20 days of the conclusion of the pending state court proceedings so that

the case can be reopened.


II.     **REPORT**

As a preliminary matter, the Court notes that Defendants filed this Motion to Dismiss at

Document No. 108 on March 16, 2009, five (5) months after Plaintiffs filed their Amended

Complaint at Document No. 36.  Yet, Defendants move to dismiss Plaintiffs' Complaint rather

than their Amended Complaint.  An amended complaint supersedes the original complaint

*Snyder v. Pascack Valley Hosp.,* 303 F.3d 271, 276 (3d Cir. 2002), and will have the following

impact on subsequent motion practice:

> A pleading that has been amended under Rule 15(a) supersedes the pleading it
> modifies and remains in effect throughout the action unless it subsequently is
> modified.  Once an amended pleading is interposed, the original pleading no

2

longer performs any function in the case and any subsequent motion made by an
opposing party should be directed at the amended pleading.

6 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1476 (2d ed.

1990) (footnotes omitted).  Consequently, the Court treats Defendants' motion at Document No.

108 as a Motion to Dismiss Plaintiffs' Amended Complaint.


A.    **Relevant Facts**

Plaintiff Daniel J. Goodson III (hereinafter "Father") is a *pro se* incarcerated individual who

has filed this civil action pursuant to 42 U.S.C. §§ 1983, 1985, 1986 and 1988 on behalf of himself

and his four minor children, D.G. VI, J.G., S.G. and D.G.  (Pls.' Compl. Overview.)[1]  Plaintiffs

assert violations of their first, fourth, fifth, sixth, thirteenth and fourteenth amendment rights.  (*Id.*)

The complaint contains a plethora of different claims regarding a variety of different situations.  The

majority of the claims, however, stem from custody proceedings regarding Father's children in the

state courts of Pennsylvania and Colorado (hereinafter the "underlying custody matter").  Plaintiffs

have named thirty-seven different defendants who are judges, courts, court employees, county

commissioners and controllers, social workers employed by various county children and youth

services, the mothers of Father's children, Father's former counsel, foster parents, a guardian ad

litem, a state trooper, a prison official, a sheriff, and state and federal prosecutors.

D.G. VI, J.G., and S.G were born to Father and his former wife, Tara Thompson.  (*Id.* at

Synopsis.)  According to Plaintiffs, Father and Thompson divorced in 2000, and Father filed for

---

[1]Plaintiffs' original complaint, received by the Clerk of Courts on January 11, 2008, contained a
number of attachments.  On October 17, 2008, Plaintiffs filed an amended complaint (Doc. No. 36),
which is essentially the same as the original complaint but without the attachments.  For ease of
reference, all citations to the complaint in this report and recommendation are to Doc. No. 36.

custody of D.G. IV, J.G., and S.G. in Westmoreland County Court of Common Pleas (hereinafter "Westmoreland County Court"). (*Id.*) In the meantime, Thompson and children moved to Colorado and she filed for divorce in the La Plata County District Court in Durango, Colorado (hereinafter "Colorado Court"). (*Id.*) Judge John Driscoll relinquished jurisdiction of the case to the Colorado Court. (*Id.* at ¶ 31.) During all or most of these four years, Father was incarcerated in the Allegheny County Jail. (*Id.* at Synopsis.) Father's parental rights were involuntarily terminated by the Colorado Court in 2004. (*Id.*)

In July 2004, D.G. was born as a result of a relationship between Father and Gina Savko. (*Id.*) In December of 2005, Father learned that D.G. was in an unsafe environment and filed for custody of D.G. in Westmoreland County Court. (*Id.*; *see also* Westmoreland County Ct. of Com. Pleas, Family Court-Custody Division, Docket No. 123 of 2006D.) He also filed a complaint with Westmoreland County Children's Bureau. (Compl. at Synopsis.) In March of 2006, Father was advised that D.G. was currently residing in Washington County, and to contact Washington County. (Letter dated 3/1/06 from Judge Driscoll's Law Clerk (copy attached to Compl.–*see* Doc. No. 1-3).) On July 27, 2006 and August 18, 2006, Washington County Children & Youth Services ("Washington County CYS") filed  Emergency Shelter Petitions and D.G. was ordered to be temporarily placed in foster care pending a hearing on the Petitions. (Emergency Shelter Petitions filed 7/27/06 and 8/18/06, and Judge Mascara's 8/18/06 Order, at No. 24 July 2006, Washington Co. Ct. Com. Pleas, Juvenile Ct. Div. (copies of which are attached to Compl.–*see* Doc. No. 1-3).) A hearing was held in Washington County Court of Common Pleas (hereinafter "Washington County Court") on August 21, 2006 on the Emergency Petitions, after which Judge Mark Mascara entered an order directing that D.G. be placed in protective physical and legal custody of Washington County

CYS.[2]   Judge Mascara also presided over subsequent juvenile court hearings regarding the Permanency Petition of Washington County CYS to determine the dependency of D.G. from August 2006 to the filing of this federal lawsuit.  (*See* Washington Co. Ct. Com. Pleas, Juvenile Ct.  Div., Docket No. 24 July, 2006/JV 274-06.)  Judge Mascara ruled that D.G. would remain in foster care, despite Father's request that she be placed with members of his family. (Compl. at ¶ 23.)  It further appears from the public docket of Washington County Court that on November 8, 2007, Judge Mascara entered an order scheduling another permanency hearing regarding D.G. on January 31, 2008.  (*See* Judge Mascara's Order dated 11/8/07, at Docket No. 24 July, 2006/JV 274-06, Washington Co. Ct. Com. Pleas, Juvenile Ct.  Div. (copy attached to Compl.–*see* Doc. No. 1-3).)  Plaintiffs commenced this federal civil action on January 10, 2008[3].

Plaintiffs' primary claim is that all Defendants have engaged in a vast conspiracy to deny Father and his family custody and visitation rights to his minor children because of his race.  (*Id.* at ¶¶ 13,14, 19, 23, 24, 29, 31, 35, 36, 44, 47, 48, 49, 51, 52, 58, 63, 70, 71, 76, 77, 81, 84.)

Plaintiffs claim that Judge Mascara conspired with other co-defendants to prevent Father or any of his relatives from receiving custody or visitation rights of D.G.  (*Id.* at ¶¶ 13, 14, 23, 44, 71, 81, 87.)  Judge Mascara allegedly perpetuated this conspiracy through his personal opinions in court

_____

[2]In addition, in his August 21, 2006 order, Judge Mascara denied Father's motion to change D.G.'s placement to paternal aunt's home and motion for change of venue to Westmoreland County, and directed that Father have no contact with D.G. at that time and that mother have weekly supervised visits provided negative drug testing results. (Judge Mascara's 8/21/06 Order, at Docket No. 24 July 2006, Washington Co. Ct. Com. Pleas, Juvenile Ct. Div. (copy of which are attached to Compl.–*see* Doc. No. 1-3).)

[3]The docket sheet caption indicates that the case was filed on January 10, 2008.  The docket sheet entries, however, indicate that the original complaint was not received by the clerk of courts until January 11, 2008 (Doc. No. 1), and was not filed until February 29, 2008 (Doc. No. 3).

documents and ex parte conferences with other co-defendants. (*Id.* at ¶ 13.) Plaintiffs maintain that Judge Mascara failed to investigate or explore the possibility of placing D.G. in the custody of any of her paternal relatives (*id.* at ¶ 24), and conspired with other co-defendants to make false statements against Father (*Id* at ¶ 23.)  Plaintiffs also allege that Judge Mascara accomplished his goal of denying Father and his family custody and visitation rights by misleading the Superior Court of Pennsylvania by concealing "exculpatory evidence," giving false testimony, failing to write "an opinion to the Superior Court," selectively using portions of documents in his findings of facts report in order to present a false account of Father's actions, and delaying transmittal of the record to the Superior Court. (*Id.* at ¶ 81.)[4]

Additionally, Plaintiffs claim that Judge Mascara conspired with the Washington County CYS to place D.G. in an undisclosed location so Father could not investigate the safety of her location. (*Id.* at ¶ 23.)   Plaintiffs have also averred that Defendant Washington County Court participated in the conspiracy to racially discriminate against them and deprive them of their rights, and they name numerous jurists (although Plaintiffs did not name them as defendants) who they believe have a role in the conspiracy, including Judge Mascara. (*Id.* at ¶¶ 51, 58, 84.) Finally, Father also alleges that after his bail hearing on December 6, 2006 in a criminal complaint against him, Judge Mascara and the Pennsylvania State Police conspired to discriminate and retaliate against him by discussing the position and defense they thought Father was going to pursue against them. (*Id.*

---

[4]It appears that the appeal to the superior court to which Father refers is the appeal docketed at No. 216 WDA 2007 in the Pennsylvania Superior Court.  Plaintiff appealed Judge Mascara's Order dated September 14, 2006 in Docket No. 24 July 2006, JV 274-06, wherein Judge Mascara found that aggravated circumstances existed with regard to the Father pursuant to 42 Pa. Cons. Stat. Ann. § 6341, after a merit hearing on the emergency shelter petition of Washington County CYS.  According to the public docket, the superior court affirmed Judge Mascara's order on November 29, 2007.

at ¶ 6; *see also* Washington County Court of Com. Pleas, Criminal Division, Docket No. 2431-2006.)[5]  Father further contends that this criminal complaint was brought based on illegally obtained statements from him prior to being Mirandized.  (Compl., ¶ 6.)

Plaintiffs further allege that Judge Driscoll improperly relinquished jurisdiction over the divorce and custody action filed by Father to the Colorado court.  (*Id.* at ¶ 31.)  Plaintiffs assert that Judge Driscoll was aware that Westmoreland County had proper jurisdiction over the case yet nonetheless relinquished jurisdiction and that such rulings violated his due process rights.  (*Id.* at ¶48.)  Father further asserts that although he has no proof, he will show communication with the other Defendants and a conspiracy against him.  (*Id.* at ¶ 49.)  Plaintiffs' allegations against the Westmoreland County Court are similar to the allegations against Judge Driscoll, *i.e.,* that the Westmoreland County Court allegedly violated Plaintiffs' rights by improperly relinquishing jurisdiction of the divorce and custody action.  (*Id.* at ¶ 52.)

As to these moving Defendants, the Amended Complaint contains allegations only generally relating to Defendants Lawrence Maggi, Diana Irey, and J. Bracken Burns in their capacity as Washington County Commissioners.  Specifically, Plaintiffs allege that "Washington County[,] by and through its employees and agencies[,] . . . discriminate[d] . . . [against] the plaintiff[,] his minor child[,] and his family by their willful actions motivated by racial discord . . .."  (*Id.* at ¶ 11.)

---

[5]The criminal complaint filed at Docket No. 2431-2006 charged Father with four counts each of Terroristic Threats under 18 PA. CONS. STAT. ANN. § 2706(a)(1); Harassment under 18 PA. CONS. STAT. ANN. § 2709(a)(4); Threats and Other Improper Influence in Official and Political Matters under 18 PA. CONS. STAT. ANN. § 4702(a)(2).  The alleged victims of these charges are three employees of the Washington County CYS and Judge Mascara, all of whom are named as defendants in this federal action.  *See Commw. of Pa. v. Goodson,* CR No. 2431-2006, Mem. Op. & Order dated August 15, 2007 (John F. Bell, S.J.)  The conduct which gave rise to the criminal charges brought against Father in No. 2431-2006 arose during the juvenile court proceedings regarding the custody of D.G. over which Judge Mascara presided.

Plaintiffs continue that this discrimination "has caused a severe amount of pain and suffering as well as emotional and psychological upset not only directed at plaintiff but minor child who has been in limbo now for over two years while enduring their targeted mistreatment of both individuals along with the entire paternal family." (*Id.*)  At Paragraph 42 of the Amended Complaint, Plaintiffs further aver that Washington County is liable for the grossly negligent actions of Washington County Children and Youth Services [hereinafter "W.C.C.Y.S."].  Plaintiffs allege that W.C.C.Y.S. operates under certain policies and customs, specifically the inadequate training of W.C.C.Y.S. staff, which has allegedly placed D.G. in danger by placing her in a known crackhouse.  *(Id.* at ¶ 42.)  Plaintiffs further aver that D.G. remained in this environment despite Father's pleas, and that W.C.C.Y.S. failed to investigate D.G.'s placement even after Father presented evidence of drug use at the residence. (*Id.* at ¶ 42.)  Plaintiffs conclude Paragraph 42 of the Amended Complaint by noting that D.G.'s complaints of pain and discomfort in her vaginal area have not been investigated by W.C.C.Y.S., nor has D.G.'s paternal relatives been considered for placement because of their race.  Finally, Plaintiffs aver that Washington County negligently permitted Gina Savko to become pregnant with D.G. when they were responsible for Savko's care while incarcerated, and Washington County allegedly attempted to cover up this fact.  (*Id.* at ¶ 62.)

The Amended Complaint contains no averments specifically directed to moving Defendant Washington County Controller Michael Namie.

As to moving Defendants W.C.C.Y.S. director Jeffrey Felton, and W.C.C.Y.S. caseworkers Patricia Maxon, Hayley Foster, Patricia Berdine, and Nancy Gray, Plaintiffs set forth numerous allegations.  Plaintiffs aver that W.C.C.Y.S. intentionally mislead Westmoreland County officials by deliberately misrepresenting the location of D.G. so that Washington County could obtain

jurisdiction over D.G.'s dependency hearing.  (*Id.* at ¶ 1.)  They also claim that W.C.C.Y.S. racially discriminated against Plaintiffs by failing to locate and interview the paternal side of D.G.'s family, failing to place D.G. with them, and instead, placing her in a dangerous environment with foster parents who were unrelated to D.G.  (*Id.* at ¶ 2.)  Plaintiffs also claim that W.C.C.Y.S. withheld evidence that supported Plaintiffs' position in related criminal and civil actions.  (*Id.* at ¶ 3.) Plaintiffs also alleged that W.C.C.Y.S. discriminated against D.G. by not allowing contact between her and her paternal grandparents.  (*Id.* at ¶ 7.)  As to Defendant Felton specifically, Plaintiffs allege that he was involved in a conspiracy to cover up W.C.C.Y.S.'s "racial hostility" and the W.C.C.Y.S.'s placement of "colored children" in dangerous environments.  (*Id.* at ¶¶ 9, 85.) Plaintiffs also aver that Felton never acted upon the complaints received from Father, and that Felton and W.C.C.Y.S. do not afford the complaints of minorities any weight because of their "personal ignorance" toward "people of color."  (*Id.* at ¶ 27.)  Plaintiffs further aver that the W.C.C.Y.S. Defendants conspired with other Defendants and one another to make untrue and defamatory statements against Father.  Plaintiffs allege that these statements were made to not only discriminate against Father, but also to retaliate against him for filing complaints against these conspiring Defendants. (*Id.* at ¶ 44.)  Further, W.C.C.Y.S. failed to turn over letters in their possession to the prosecutor which would have exonerated Father.  (*Id.* at ¶ 34.)  Finally, Plaintiffs aver that W.C.C.Y.S. violated several provisions of the "federal adoption act" and selectively prosecuted Father, but failed to prosecute the "white mother."  (*Id.* at ¶¶ 28, 73.)

        With regard to Patricia Maxon, W.C.C.Y.S. caseworker, Plaintiffs aver that she was recently relieved of her duties due to the "racially-motivated climate" at the agency and that she and Defendants Foster, Berdine, and Gray refused to meet, interview, or do a home evaluation of the

paternal relatives because they are black.  (*Id.* at ¶ 26.)  As to Defendant Hayley Foster, Plaintiffs

allege that she conspired with Defendants Felton, Gray and Joyce Wise[6] to conceal incriminating

evidence relating to Defendant Foster[7].  (*Id.* at ¶ 82.)  Plaintiffs further aver that moving Defendant

caseworker Patricia Berdine placed D.G. in a known drug environment, causing her to test positive

for the ingestion of cocaine, and that Berdine and Gray conspired with other defendants to racially

discriminate against Father.  (*Id.* at ¶¶ 15, 71.)  Plaintiffs also aver that Defendant Gray told Father

that "[b]lack men in jail are statistically not fathers" when Father was "pleading to have his daughter

removed" from the allegedly dangerous placement.  (*Id*. at ¶ 20.)   Finally, Plaintiffs aver that

Defendants Felton, Wise, and Gray are responsible for W.C.C.Y.S.'s actions and attitudes relating

to its alleged discrimination against black people.  (*Id*. at ¶ 85.)

Plaintiffs set out numerous averments relating to moving Defendant Warden of

Washington County Correctional Facility, John Doe [hereinafter "W.C.C.F."and identified in

Defendants' Brief in Support of Motion to Dismiss as Joe Pelzar (Doc. No. 109 at 12)].  Father

avers that upon being placed in administrative custody, he was served with no paperwork and

was told that "it's because of your penmanship you are in A.C. status."  Father states that he was

placed in administrative custody in retaliation for complaining about W.C.C.F. and for filing

legal paperwork.  (Doc. No. 36 at ¶ 54.)  Further, he indicates that he was denied access to law

materials, "photo copies," that his mail was censored, and that W.C.C.F. made it difficult for him

to access paper and envelopes.  (*Id.*)  Father also avers that he was placed in 24 hour lock down

---

[6]Joyce Wise is not named as a party in the above captioned amended complaint.

[7]In Paragraph 82 of the amended complaint, Plaintiff Father avers that Felton, Gray, Foster, and Wise "are rumored by other office personell [sic] as being racist sex maniacs and are also known to have after hour office orgies."  (Doc. No. 36 at ¶ 82.)

and that W.C.C.F. refused to return Father to SCI Mahanoy even though three court orders were issued ordering his return.  (*Id.*)  Father also alleges he was denied his right to freely practice his religion because he was not provided with any "spiritual representative" during his time in administrative custody, and that no church services were offered.  (*Id.*)  Father further avers that W.C.C.F. allowed Savko to have sex and become pregnant with D.G. while Savko was in its custody, and that it conspired with Westmoreland and Allegheny counties to conceal these facts. (*Id.* at ¶¶ 61, 62.)  Plaintiff Father also indicates that W.C.C.F. failed to provide him with adequate medical care and the corrections officers were deliberately indifferent to his serious medical needs.  (*Id.* at ¶ 83.)[8]

Next, Plaintiffs aver that Washington County District Attorney John Pettit maliciously prosecuted Father in retaliation for filing complaints against the District Attorney's Office's "constituents."  In addition, Plaintiffs aver that the District Attorney's Office lied to the presiding judge concerning delays with the case to avoid dismissal, and that the Office failed to respond to Father's criminal complaints against Savko.  Plaintiffs conclude that this Defendant chose not to prosecute based upon racial discrimination and their "friendship and constituency" with other co-defendants.  (*Id.* at ¶¶ 55, 86.)

As to moving Defendant Washington County Deputy District Attorney Michael Lucas, Plaintiffs aver that he withheld exculpatory evidence and conspired with other defendants to present false evidence to maliciously prosecute Father.  (*Id.* at ¶ 55.)

---

[8]These claims regarding Father's conditions of confinement do not appear to have any relation to the other claims in this suit and, in actuality, should have been filed in a completely separate lawsuit. The same could be stated regarding some of his claims against other defendants in the case. A reading of Plaintiff's complaint shows that it is the proverbial "kitchen sink."

Plaintiffs allege that moving Defendant Washington County Sheriff Samuel Romano purposely violated three court orders issued by Washington County Criminal Judge Bell by not returning Father to SCI Mahanoy and that the Sheriff's Department negligently allowed Savko to become pregnant with D.G. while it was responsible for Savko's care, and then attempted to coverup this fact.  (*Id.* at ¶¶ 56, 62.)

As to moving Defendants Matheny, Washington County Prothonotary, and Gibbs, Washington County Clerk of Courts, Plaintiffs aver that these moving Defendants conspired with one another and other defendants to not properly document or file certain records, letters, and evidence that was properly received.  (*Id.* at ¶ 88.)

Finally, Plaintiffs assert state law claims against all Defendants for outrageous conduct, intentional infliction of emotional distress, and gross negligence.

Plaintiffs seek generally declaratory, injunctive and monetary relief against all Defendants.  (*Id.* at Posture.)  Specifically, Plaintiffs request the following injunctive and/or declaratory relief:

    (1)    enjoin the State of Pennsylvania from seeking to enforce its final judgment in the interest of DG a minor child at JV 274-06, Washington County, Pennsylvania;

    (2)    order that the names of the minor children be changed back to their birth names;

    (3)    order that D.G. IV, J.G., and S.G. be returned to Pennsylvania and that they be placed under the guardianship of their paternal grandparents;

    (4)    order that jurisdiction in all custody matters be remanded to the Westmoreland County Court and Westmoreland County  CYS.

(*Id.*)  In addition, Plaintiffs ask this Court to  order (1) the filing of federal criminal charges

against those defendants as warranted and (2) a federal investigation of all Defendants' conduct and actions in regard to the complaint.  With regard to monetary relief, Plaintiffs seek from each Defendant compensatory damages in the amount of $50,000 and punitive damages in the amount of $100,000.  (*Id.*)

The moving Defendants have filed a Joint Motion to Dismiss pursuant to FED.R.CIV.P. 12(b)(1) and (6).  Defendants argue the following in support of their motion: 1) the Court must abstain from considering Plaintiffs' claims pursuant to *Younger v. Harris*; 2) Plaintiffs' claims are barred by the *Rooker-Feldman* doctrine; and 3) in the alternative, Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

### B.    *Younger* Abstention

Defendants' first argument in support of their motion to dismiss involves the threshold inquiry regarding abstention[9].  Their abstention argument relates to the allegations against the Washington County defendants involved in the ongoing family law proceedings involving minor child D.G.  (Doc. No. 109 at 6-9.)  Specifically, Defendants Washington County CYS director Jeff Felton, and CYS caseworkers Patricia Maxon, Hayley Foster, Patricia Berdine, and Nancy Gray argue that they should be dismissed on grounds of abstention pursuant to the United States Supreme Court decision in *Younger v. Harris*, 401 U.S. 37 (1971).

Generally, federal courts must adjudicate all cases and controversies that are properly

---

[9]*Younger* abstention "represents the sort of 'threshold question' [that] may be resolved before addressing jurisdiction."  *Lazaridis v. Wehmer*, No. 09-1342, __ F.3d __, 2010 WL 27216, at *3 n.3 (3d Cir. January 7, 2010) (quoting *Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005)); *Brooks-McCollum v. Delaware,* 213 Fed. Appx. 92, 94 n.2 (3d Cir. 2007) (also quoting *Tenet,* 544 U.S. at 6 n.4).

before them. *New Orleans Pub. Serv., Inc. v. City of New Orleans,* 491 U.S. 350, 358 (1989).

Abstention, however, "is the judicially created doctrine under which a federal court will decline

to exercise its jurisdiction so that a state court or state agency will have the opportunity to decide

the matters at issue." *Heritage Farms, Inc. v. Solebury Twp.*, 671 F.2d 743, 746 (3d Cir. 1982).

In *Younger v. Harris*, the United States Supreme Court "established a principle of abstention

when federal adjudication would disrupt an ongoing state criminal proceeding." *Yi Yang v. Tsui*,

416 F.3d 199, 202 (3d Cir. 2005) (discussing *Younger,* 401 U.S. 37 (1971)).  This principle has

been subsequently extended to civil proceedings and state administrative proceedings. *Yi Yang*,

416 F.3d at 201-02 (citing *Moore v. Sims*, 442 U.S. 415 (1979) (other citations omitted)).  The

*Younger* Court based its decision on the principles of comity and "the longstanding public policy

against federal court interference with state court proceedings."  *Younger*, 401 U.S. at 43.

Absent extraordinary circumstances,[10] *Younger* abstention will apply when the following three

requirements are met: "(1) there are ongoing state proceedings that are judicial in nature; (2) the

state proceedings implicate important state interests; and (3) the state proceedings afford an

adequate opportunity to raise the federal claims." *Lazaridis v. Wehmer*, No. 09-1342, __ F.3d __,

2010 WL 27216, at *3 (3d Cir. January 7, 2010) (quoting *Addiction Specialists, Inc. v. Twp. of*

*Hampton*, 411 F.3d 399, 408 (3d Cir. 2005)).  Plaintiffs' claims against the moving Defendants

that were allegedly concerned with the ongoing family court proceedings relating to minor child

D.G. satisfy each of these requirements.

---

[10]Even when all requirements are met, *Younger* abstention is not appropriate when "(1)
the state proceedings are being undertaken in bad faith or for purposes of harassment or (2) some
other extraordinary circumstances exist, such as proceedings pursuant to a flagrantly
unconstitutional statute . . .." *Schall v. Joyce*, 885 F.2d 101, 106 (3d Cir. 1989).

First, Plaintiffs aver in Paragraph 35 of their Amended Complaint that the action filed by W.C.C.Y.S. in the Washington County Court of Common Pleas, Juvenile Division (274-06 JV) against Father to terminate his parental rights as to D.G. is still pending.  (Doc. No. 35 at ¶ 35.) The Court takes judicial notice of the docket sheet for the Pennsylvania State Supreme Court at No. 14 WAL 2010 which indicates that Father filed a Petition for Allowance of Appeal on January 7, 2010 at Trial Court Docket No. CP-63-DP-0000274-2006[11].  Defendants argue that because Father filed this federal court action and requested that the federal court "interfere in the state court proceedings by obtaining an injunction to modify or rescind the state's custody and visitation orders, . . . and transfer the family law proceedings from Washington County to Westmoreland County," the federal district court's entertainment of this action "would clearly interfere with an ongoing state judicial proceeding."  (Doc. No. 109 at 7.)  The Court agrees, and consequently, the first requirement of the *Younger* analysis is met.

Next, it is also clear that the state proceedings implicate important state interests.  Federal courts have long recognized the special expertise and experience of the state courts in the field of domestic relations, including child custody and visitation.  *See Moore v. Sims*, 442 U.S. 415, 435 (1975) ("Family relations are a traditional area of state concern."); *Magaziner v. Montemuro,* 468

---

[11]Further, the docket sheet for CP-63-DP-0000274-2006 in the Court of Common Pleas of Washington County, Juvenile Division, does not indicate that a Petition for allowance of Appeal to the Pennsylvania Supreme Court was filed from the Superior Court's affirmance on November 29, 2007, at 216 WDA 2007, of Judge Mascara's September 14, 2006 order.  Consequently, for purposes of *Younger,* the Court must consider the proceedings relating to Judge Mascara's Order of September 14, 2006 as pending.  *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 609 (1975) (*Younger* bars federal intervention in state judicial proceeding where losing litigant has not exhausted appellate relief).  *See also Marks v. Stinson,* 19 F.3d 873, 883 (3d Cir. 1994) (Third Circuit clarifies *Huffman,* noting that "[e]xhaustion of appellate remedies is required by *Younger* only when the federal proceedings seek effectively to annul the state judgment.") (discussing *Wooley v. Maynard,* 430 U.S. 705 (1977)).

F.2d 782, 787 (3d Cir. 1972); *Fuller v. Harding*, 699 F. Supp. 64, 67 (E.D. Pa. 1988), *aff'd*, 875

F.2d 310 (3d Cir. 1989) (state has important interest in law of domestic relations).

Finally, the Pennsylvania state courts presented an adequate forum in which Plaintiff

Father could pursue his § 1983 civil rights claims and his related §§ 1985 and 1986 conspiracy

claims against the moving Defendants.  As noted in *Lazaridis*, a federal Plaintiff may not escape

*Younger* abstention by failing to assert claims that he had an opportunity to present in the state

proceedings.  No. 09-1342, __ F.3d __, 2010 WL 27216, at *3 (citing *Juidice v. Vail*, 430 U.S.

327, 337 (1977)).  Simply because Plaintiffs may be precluded from raising their alleged federal

constitutional claims now in the state court, they "cannot escape *Younger* abstention by failing to

assert . . . remedies in a timely manner [in state court]."  *Id.* (citing *Pennzoil Co. v. Texaco, Inc.*,

481 U.S. 1, 16 n.16 (1987)).  Moreover, Pennsylvania state courts are fully competent to decide

federal constitutional questions.  *Fuller*, 699 F. Supp. at 67; *Murtagh v. County of Berks,* 634

A.2d 179, 182-83 (Pa. 1993), *disapproved on other grounds, Garrett Group v. County of*

*Schuylkill*, 667 A.2d 255 (Pa. Cmwlth. 1995).  The Court is ever mindful of the *pro se* status of

Plaintiff Father.  The law is clear, however, that the burden of the third prong of the *Younger*

analysis "rests on the federal plaintiff to show that state procedural law barred presentation of

[his] claims."  *Anthony v. Council*, 316 F.3d 412, 422 (3d Cir. 2003) (quoting *Pennzoil Co.,* 481

U.S. at 14).  Plaintiff Father has failed to carry his burden.  "[W]hen a litigant has not attempted

to present his federal claims in related state-court proceedings, a federal court should assume that

state procedures will afford an adequate remedy, in the absence of unambiguous authority to the

contrary."  *Pennzoil Co.,* 481 U.S. at 15.  Plaintiffs have presented no authority here, and the

Court has uncovered no procedural barriers to bringing federal civil rights claims in a

Pennsylvania state court. *See generally Haywood v. Drown,* 129 S. Ct. 2108, 2115-17 (May 26, 2009) (New York state law violated supremacy clause in barring federal § 1983 claims for damages from New York state courts; when states create courts of general jurisdiction, states cannot procedurally bar federal § 1983 claims in those state courts.).

In light of the above, the claims for declaratory and injunctive relief against Washington County and Washington County Children and Youth Services should be dismissed.

The United States Supreme Court has not decided whether *Younger* abstention applies to actions for monetary damages as well as claims for equitable relief. *Marran v. Marran,* 376 F.3d 143, 154-55 (3d Cir. 2004) (discussing *Deakins v. Monaghan*, 484 U.S. 193, 202 (1988) and *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 719 (1996)). The United States Supreme Court, however, has approved the rule in the Third Circuit Court of Appeals "requiring courts to stay, rather than dismiss, actions for damages that were not cognizable in ongoing state proceedings." *Marran,* 376 F.3d at 155 (citing *Deakins,* 484 U.S. at 202). The Third Circuit's approach "allows a parallel state proceeding to go forward without interference from its federal sibling, while enforcing the duty of the federal courts to assume jurisdiction where jurisdiction properly exists." *Deakins,* 484 U.S. at 202-03 (internal quotations omitted). *See also Addiction Specialists, Inc. v. Twp. Of Hampton,* 411 F.3d 399, 414 (3d Cir. 2005) (citing *Williams v. Hepting,* 844 F.2d 138, 144-45 (3d Cir. 1988) ("[A] district court, when abstaining from adjudicating a claim for injunctive relief, should stay and not dismiss accompanying claims for damages . . . when such relief is not available from the ongoing state proceedings.")). Consequently, any remaining claims for monetary relief against these moving Defendants should be stayed pending the conclusion of the state court action.

**C.    Subject Matter Jurisdiction**

A motion to dismiss under Rule 12(b)(1) may be treated as either a facial or factual challenge to the court's subject matter jurisdiction. *Patsakis v. Greek Orthodox Archdiocese of America*, 339 F. Supp.2d 689, 692 (W.D. Pa. 2004) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir. 1977)); *Gould Electronics, Inc. v. United States,* 220 F.3d 169, 176 (3d Cir. 2000). In the case at bar, Defendants appear to be making a facial challenge, as evidenced by their brief in support of the Joint Motion to Dismiss, as well as the fact that they have not produced any affidavits or evidence to disprove any of Plaintiffs' factual allegations regarding jurisdiction.  In a facial attack, the court must consider the allegations of the complaint as true, in the light most favorable to the plaintiff, similar to a motion to dismiss under Rule 12(b)(6).  *Mortensen,* 549 F.2d at 891; *In re Kaiser Group Int'l, Inc.,* 399 F.3d 558, 561 (3d Cir. 2005).

A Rule 12(b)(1) motion is the proper vehicle for asserting lack of subject matter jurisdiction based upon the *Rooker-Feldman* doctrine.  *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 416 (1923) (holding that under Congressional legislation, only the Supreme Court has the authority to entertain a proceeding to reverse or modify the judgment of a state court, as to do so would constitute an exercise of appellate jurisdiction; district courts, on the other hand, are vested strictly with original jurisdiction and therefore lack authority to review a state court judgment); *Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482 (1983) (holding district court has no subject matter jurisdiction to review final judgments of a state court because only the Supreme Court has jurisdiction to review state court judgments under 28 U.S.C. § 1257).

Here, Defendants argue that "the crux of Plaintiff's Complaint is that defendants violated his federal constitutional rights through various actions taken and orders entered in a child custody and

18

visitation litigation between Plaintiff and Savko and also through defendants' pursuit of terminating his parental rights to DG in a separate action . . . ."(Doc. No. 109 at 10.)  The moving Defendants further note that in addition to money damages, Plaintiffs are also seeking "an order enjoining the state courts from enforcing any final judgment in regards to DG." (*Id.*)

The *Rooker-Feldman* doctrine is a judicially-created doctrine that bars lower federal courts from reviewing certain state court actions.  The doctrine originated from two Supreme Court opinions: *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923)*, and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983).  Specifically, the *Rooker-Feldman* doctrine holds that a United States District Court has no subject mater jurisdiction to review final judgments of a state court, because only the Supreme Court has jurisdiction to review state court judgments under 28 U.S.C. § 1257.  *Feldman*, 460 U.S. at 482.[12] "The Rooker-Feldman doctrine is based on the statutory foundation of 28 U.S.C. § 1257 and the well-settled understanding that the Supreme Court of the United States, and not the lower federal courts, has jurisdiction to review a state court decision." *Parkview Assocs. P'ship v. City of Lebanon*, 225 F.3d 321, 324 (3d Cir. 2000); *see also Gulla v. North Strabane Twp.*, 146 F.3d 168, 171 (3d Cir. 1998).  This doctrine applies even where the challenges to the state court judgment allege that the state court's action was unconstitutional, such as a deprivation of due process and equal protection rights.  *Feldman,* 460 U.S. at 485-86 (citation omitted).

In *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, the Supreme Court emphasized the narrowness of the doctrine and held that *Rooker-Feldman* is "confined to cases of the kind from

---

[12]Habeas corpus petitions are an exception to the jurisdictional bar of *Rooker-Feldman*.  *See Walker v. Horn,* 385 F.3d 321, 329 n.22 (3d Cir. 2004) (citations omitted).

which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejections of those judgments." 544 U.S. 280, 284 (2005); *see also Turner v. Crawford Square Apartments III, L.P.*, 449 F.3d 542, 544 (3d Cir. 2006) (citing *Exxon Mobil, id.*).[13] The Court in *Exxon Mobil* further clarified that just because a federal claim was previously adjudicated in state court does not trigger the application of *Rooker-Feldman*.  Thus, the court must determine if the plaintiff in the federal lawsuit has presented "some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party." *Exxon Mobil,* 544 U.S. at 293 (citations omitted).  If the court finds that an independent claim has been presented, then jurisdiction exists and state law controls whether the defendant prevails on preclusion principles.  *Id.*  As the Court pointed out, "[p]reclusion, of course, is not a jurisdictional matter." *Id.* (citing Fed. R. Civ. P. 8(c)).

Shortly after the Supreme Court's determination in *Exxon Mobil*, the United States Court of Appeals for the Third Circuit, while acknowledging the recent *Exxon Mobil* decision, still  applied the two-step *Rooker-Feldman* inquiry that it had applied in the past–a claim in federal court will be barred by *Rooker-Feldman* under two circumstances: "first, if the federal claim was  actually litigated in state court prior to the filing of the federal action or, second, if the federal claim is inextricably intertwined with the state adjudication, meaning that federal relief can only be predicated upon a conviction that the state court was wrong." *In Re Knapper*, 407 F.3d 573, 580 (3d Cir. 2005).  More recently, however, the court of appeals has cautioned that reliance on its pre-*Exxon*

---

[13]The *Rooker-Feldman* doctrine applies to final decisions of lower state courts.  *Walker v. Horn,* 385 F.3d 321, 329 (3d Cir. 2004) (citation omitted).

formulation of the *Rooker-Feldman* doctrine, and in particular the "inextricably intertwined" prong, may no longer be appropriate. *See, e.g., Gary v. Braddock Cemetary,* 517 F.3d 195, 200 n.5 (3d Cir. 2008) (citations omitted); *East Hill Synagogue v. City of Englewood,* 240 Fed. Appx. 938, 940 n.1 (3d Cir. 2007) (noting that after *Mobil,* "[t]here is little reason to believe that 'inextricably intertwined' . . . does anything more than state a conclusion or describe a claim that meets the requirements of *Exxon*.") (collecting decisions from other courts of appeals).

Although the United States Court of Appeals for the Third Circuit has not expressly ruled on the continued viability of its prior formulation of the *Rooker-Feldman* inquiry since the Supreme Court's decision in *Exxon Mobil,* at least three other courts of appeals have done so. *See, e.g., Hoblock v. Albany County Bd. of Elections,* 422 F.3d 77, 85-89 (2d Cir. 2005); *McCormick v. Braverman,* 451 F.3d 382, 393-94 (6th Cir. 2006); *Davani v. Virginia Dep't of Transp.,* 434 F.3d 712, 717-19 (4th Cir. 2006). This Court finds that the discussions by the courts of appeals in *Holblock, McCormick*, and *Davini*, although not binding, are instructive and well reasoned, and thus, provide guidance to this Court in determining the appropriate test for applying *Rooker-Feldman* post-*Exxon Mobil*.

The court of appeals in *Hoblock* distilled the Supreme Court's holding in *Exxon Mobil* as setting forth four requirements in order for *Rooker-Feldman* to apply:

> First, the federal-court plaintiff must have lost in state court. Second, the plaintiff must "complain[ ] of injuries caused by [a] state-court judgment[.]" Third, the plaintiff must "invit[e] district court review and rejection of [that] judgment[ ]." Fourth, the state-court judgment must have been "rendered before the district court proceedings commenced"-i.e., *Rooker-Feldman* has no application to federal-court suits proceeding in parallel with ongoing state-court litigation. The first and fourth of these requirements may be loosely termed procedural; the second and third may be termed substantive.

422 F.3d at 85 (quoting *Exxon Mobil*, 544 U.S. at 284) (footnote omitted).   Moreover, the "inextricably intertwined" basis for applying *Rooker-Feldman* to bar federal claims no longer appears to provide an independent basis for applying the doctrine post-*Exxon Mobil*.  In this regard, the court of appeals in *McCormick* opined that the Supreme Court in *Exxon Mobil*:

> implicitly repudiated the circuits' post- *Feldman* use of the phrase "inextricably intertwined" to extend *Rooker-Feldman* to situations where the source of the injury was not the state court judgment. In short, the phrase "inextricably intertwined" only describes the conclusion that a claim asserts an injury whose source is the state court judgment, a claim that is thus barred by *Rooker-Feldman*.

*McCormick,* 451 F.3d at 394-95 (noting agreement by courts of appeals in *Davani* and *Hoblock* that the phrase "inextricably intertwined" has no independent content and is simply a descriptive label attached to claims that meet the requirements set forth in *Exxon Mobil*) (citing *Davani*, 434 F.3d at 719; *Hoblock*, 422 F.3d at 86-87).  Indeed, two panels of the United States Court of Appeals for the Third Circuit appear to agree with this conclusion.  *See Gary v. Braddock Cemetary,* 517 F.3d 195, 200 n. 5 (3d Cir. 2008) (citations omitted); *East Hill Synagogue v. City of Englewood,* 240 Fed. Appx. 938, 940 n. 1 (3d Cir. 2007).

In *Hoblock, McCormick,* and *Davani,*  the courts of appeals found that the key to determining whether the  *Rooker-Feldman* doctrine applies, post-*Exxon Mobil*, is identifying the source of the injury alleged in the federal complaint.  If the source of the injury is the state court decision, then the *Rooker-Feldman* doctrine will apply to divest the district court of jurisdiction.  *Hoblock,* 422 F.3d at 87; *McCormick*, 451 F.3d at 393; *Davani,* 434 F.3d at 718-19.  The *Hoblock* court provided a further explanation of this core requirement:

> First, this requirement explains why a federal plaintiff cannot escape

the *Rooker-Feldman* bar simply by relying on a legal theory not raised in state court. Suppose a state court, based purely on state law, terminates a father's parental rights and orders the state to take custody of his son. If the father sues in federal court for the return of his son on grounds that the state judgment violates his federal substantive due-process rights as a parent, he is complaining of an injury caused by the state judgment and seeking its reversal. This he may not do, regardless of whether he raised any constitutional claims in state court, because only the Supreme Court may hear appeals from state-court judgments.

Further, by focusing on the requirement that the state-court judgment be the source of the injury, we can see how a suit asking a federal court to "den[y] a legal conclusion" reached by a state court could nonetheless be independent for *Rooker-Feldman* purposes. Suppose a plaintiff sues his employer in state court for violating both state anti-discrimination law and Title VII and loses. If the plaintiff then brings the same suit in federal court, he will be seeking a decision from the federal court that denies the state court's conclusion that the employer is not liable, but he will not be alleging injury from the state judgment. Instead, he will be alleging injury based on the employer's discrimination. The fact that the state court chose not to remedy the injury does not transform the subsequent federal suit on the same matter into an appeal, forbidden by *Rooker-Feldman*, of the state-court judgment.[14]

422 F.3d at 87-88.

The *Hoblock* court further noted that a federal plaintiff cannot avoid *Rooker-Feldman* simply by clever pleading, that is, by alleging that actions taken pursuant to a court order violate his rights without ever challenging the court order itself. *Id.* at 88. Thus, with regard to the child custody example discussed above, "if the state has taken custody of a child pursuant to a state judgment, the parent cannot escape *Rooker-Feldman* simply by alleging in federal court that he was injured by the state employees who took his child rather than by the judgment authorizing them to take the child."

---

[14]"The subsequent federal suit could, of course be barred by ordinary preclusion principles." *Hoblock*, 422 F.3d at 88 n.6 (citing *Exxon Mobil*, 544 U.S. at 293).

23

*Id.* The challenge will be for the courts to identify which federal lawsuits actually complain of injury by state court judgments and which do not. *Id.* Thus, in making this determination, the *Hoblock* court was guided by the following formula: "a federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it. Where a state-court judgment causes the challenged third-party action, any challenge to that third-party action is necessarily the kind of challenge to the state judgment that only the Supreme Court can hear." *Id.*

In the instant matter, with regard to Plaintiffs' claims against the W.C.C.Y.S. Defendants, the Court finds that the four requirements have been met relating to at least one state court judgment. Plaintiff Father was the losing party as a result of Judge Mascara's September 14, 2006 order regarding the emergency shelter petition brought by the W.C.C.Y.S. *See* Doc. No. 1-3 at 27-29, 35-36. This order was appealed to the Pennsylvania Superior Court at 216 WDA 2007.[15] Second, it is clear that a source of Plaintiffs' alleged injuries in this federal action is the state court judgment of September 14, 2006 order entered by Washington County Judge Mascara. Plaintiffs' complaint in federal court attempts to aver that their federal constitutional rights were violated through various actions taken by these moving Defendants and orders entered in the child custody and visitation litigation between Plaintiff Father and Defendant Savko. In addition to money damages, Plaintiff seeks an order enjoining the state courts from enforcing any final judgment relating to D.G., and an order that jurisdiction in all custody matters be remanded to the Westmoreland County Court and

---

[15]The Superior Court affirmed this state court judgment on November 29, 2007, although the public docket does not reflect that Plaintiff Father appealed the Superior Court's affirmance to the Pennsylvania Supreme Court. *See* 216 WDA 2007, http://ujsportal.pacourts.us.

Westmoreland County CYS.  Even though Plaintiffs raise violations of federal constitutional rights, as well as state law claims for an egregious abuse of governmental power, intentional infliction of emotional distress, and gross negligence in this federal action, these theories of recovery all seek redress for injuries caused, in part, by the state court judgments issued by Judge Mascara in the underlying custody, visitation and dependency matters.  Moreover, it is clear from Plaintiffs' prayer for relief, that they are seeking reversal of these judgments.  Plaintiffs are, in essence, seeking appellate review of the state court judgments, and therefore, the Court finds that a source of Plaintiffs' alleged injuries in this federal action is the state court judgments issued by the Washington County Court.  The third requirement under *Exxon Mobil* is also satisfied here because, as discussed, Plaintiffs specifically seek an injunction barring enforcement of the state court judgment, and restoration of Father's parental rights, and an award of custody to the paternal grandparents which, if granted, would effectuate a reversal of the state court judgment.  Finally, it is clear that the Washington County order complained of was entered well before the commencement of this federal litigation in January, 2008.  Accordingly, the Court lacks subject matter jurisdiction over the claims asserted against Washington County Children and Youth Services, its director Jeffrey Felton, and its caseworkers, Patricia Maxon, Hayley Foster, Patricia Berdine, and Nancy Gray under *Rooker-Feldman*.

### D.    **Failure to State a Claim**

Defendants argue in the alternative that Plaintiffs' claims must be dismissed with prejudice because Plaintiffs' Amended Complaint fails to state a claim upon which relief may be granted.

In the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), Congress adopted major changes affecting federal actions brought by prisoners in an effort to curb the increasing number of frivolous and harassing law suits brought by persons in custody. The authority granted to federal courts for *sua sponte* screening and dismissal of prisoner claims in the PLRA is applicable to this case.

Specifically, Congress enacted a new statutory provision at 28 U.S.C. § 1915A, entitled "Screening," which requires the court to review complaints filed by prisoners seeking redress from a governmental entity or an officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). If the complaint is "frivolous, malicious, or fails to state a claim upon which relief can be granted," or "seeks monetary relief from a defendant who is immune from such relief," the court must dismiss the complaint. 28 U.S.C. § 1915A(b).

In addition, Congress significantly amended Title 28 of the United States Code, § 1915, which establishes the criteria for allowing an action to proceed *in forma pauperis* ("IFP"), *i.e.* without prepayment of costs. Section 1915(e) (as amended) requires the federal courts to review complaints filed by persons that are proceeding *in forma pauperis* and to dismiss, at any time, any action that is frivolous or malicious, fails to state a claim on which relief can be granted, or seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B).

Plaintiff Father is considered a "prisoner" as that term is defined under the PLRA[16], and

----

[16]Sections 1915 and 1915A, as amended, define the term "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 28 U.S.C. §§ 1915(h);; 1915A(c).

the moving Defendants herein are governmental entities or individuals sued in their official capacities of various governmental entities.  Moreover, Plaintiff Father is proceeding IFP in this action.  (Doc. No. 2.)  Thus his allegations must be reviewed in accordance with 28 U.S.C. § 1915A and 28 U.S.C. § 1915(e)(2)(B).

In reviewing complaints under 28 U.S.C. § 1915A and 28 U.S.C. § 1915(e)(2)(B), a federal court applies the same standard applied to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6).  *See, e.g. Anyanwutaku v. Moore,* 151 F.3d 1053 (D.C. Cir. 1998); *Mitchell v. Farcass,* 112 F.3d 1483, 1484 (11th Cir. 1997); *Powell v. Hoover,* 956 F. Supp. 564, 568 (M.D. Pa. 1997) (applying Rule 12(b)(6) standard to claim dismissed under 28 U.S.C. § 1915(e)(2)(B)(ii)); *Tucker v. Angelone,* 954 F. Supp. 134 (E.D. Va.), *aff'd,* 116 F.3d 473 (Table) (4th Cir. 1997).

### 1.      Legal Standard

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of a complaint. *Kost v. Kozakiewicz,* 1 F.3d 176, 183 (3d Cir. 1993).  A complaint must be dismissed for failure to state a claim if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 556 (2007) (rejecting the traditional 12(b)(6) standard set forth in *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)); *Ashcroft v. Iqbal,* 129 S. Ct.1937, 1949 (May 18, 2009) (citing *Twombly,* 550 U.S. at 555-57).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S. Ct. at 1949 (citing *Twombly,* 550 U.S. at 556).  The Supreme Court further explained:

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* (citing *Twombly*, 550 U.S. at 556-57).

Recently, in *Fowler v. UPMC Shadyside*, 578 F.3d 203 (3d Cir. Aug. 18, 2009), the United States Court of Appeals for the Third Circuit discussed its decision in *Phillips v. County of Allegheny,* 515 F.3d 224, 232-33 (3d Cir. 2008) (construing *Twombly* in a civil rights context), and described how the Rule 12(b)(6) standard had changed in light of *Twombly* and *Iqbal* as follows:

> After *Iqbal,* it is clear that conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S. Ct. at 1949. To prevent dismissal, all civil complaints must now set out "sufficient factual matter" to show that the claim is facially plausible. This then "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1948. The Supreme Court's ruling in *Iqbal* emphasizes that a plaintiff must show that the allegations of his or her complaints are plausible. *See Id.* at 1949-50; *see also Twombly,* 505 U.S. at 555, & n. 3.

*Fowler,* 578 F.3d at 210.

Thereafter, in light of *Iqbal*, the *Fowler* court set forth a two-prong test to be applied by the district courts in deciding motions to dismiss for failure to state a claim:

> First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. [*Iqbal,*129 S. Ct. at 1949]. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." *Id.* at 1950. In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts.

28

> *See Phillips,* 515 F.3d at 234-35.  As the Supreme Court instructed in
> *Iqbal,* "[w]here the well-pleaded facts do not permit the court to infer
> more than the mere possibility of misconduct, the complaint has
> alleged-but it has not 'show [n]'-'that the pleader is entitled to
> relief.'" *Iqbal,* 129 S. Ct. at 1949. This "plausibility" determination
> will be "a context-specific task that requires the reviewing court to
> draw on its judicial experience and common sense." *Id.*

*Fowler,* 578 F.3d at 210-11.

In addition to the complaint, courts may consider matters of public record and other matters of which a court may take judicial notice, court orders, and exhibits attached to the complaint when adjudicating a motion to dismiss under Rule 12(b)(6).  *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1385 n.2 (3d Cir. 1994).  A court may also consider indisputably authentic documents.  *Spruill v. Gillis,* 372 F.3d 218, 223 (3d Cir. 2004).  Finally, the Court must employ less stringent standards when considering *pro se* pleadings than when judging the work product of an attorney.  *Haines v. Kerner,* 404 U.S. 519, 520 (1972).

## 2.      Analysis

Section 1983 of the Civil Rights Act provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom,
> or usage of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or any other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured
> by the Constitution and laws, shall be liable to the party injured in an action at law,
> suit in equity, or other proper proceeding for redress . . ..

42 U.S.C. § 1983.  To state a claim for relief under this provision, the Plaintiff must demonstrate that the conduct in the complaint was committed by a person or entity acting under color of state law and

that such conduct deprived the plaintiff of rights, privileges or immunities secured by the Constitution or the laws of the United States. *Piecknick v. Commonwealth of Pennsylvania*, 36 F.3d 1250, 1255-56 (3d Cir. 1994). Section 1983 does not create rights; it simply provides a remedy for violations of those rights created by the United States Constitution or federal law. *Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

      a.    Washington County Commissioners Lawrence Maggi, Diana Irey, J. Bracken Burns, and Washington County Controller Michael Namie

In their Brief in Support of Motion to Dismiss, Defendants argue that the Amended Complaint must be dismissed because 1) the Amended Complaint fails to set forth any facts describing how these individuals allegedly violated Plaintiffs' Constitutional rights or played any role in the events in issue; and 2) the Amended Complaint contains no allegations that the Commissioners, in their policy making positions, enacted any policies that violated Plaintiffs' rights. (Doc. No. 109 at 11.)

In order to state a claim against these individuals pursuant to § 1983, Plaintiffs are required to allege facts demonstrating that they had personal involvement in the alleged wrongs. Section 1983 liability may not be predicated upon on the operation of *respondeat superior*. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). The Amended Complaint fails to set forth any allegations as to how these individuals were personally involved in the events surrounding Plaintiffs' alleged constitutional violations.

Moreover, Plaintiffs have failed to make out a claim against these defendants in their capacity as policymakers, for purposes of municipal liability and failure to train.

In *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978), the United States Supreme Court held that municipalities and other local governmental units are "persons" subject

to liability under 42 U.S.C. § 1983.  In so ruling, however, the Court declared that municipal

liability may not be premised on the mere fact that the governmental unit employed the offending

official, that is, through application of the doctrine of *respondeat superior*.  Instead, the Court

concluded that a governmental unit may be liable under § 1983 only when its "policy or custom,

whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent

official policy, inflicts the injury." *Monell*, 436 U.S. at 694.  The "official policy" requirement

distinguishes acts of the municipality from acts of employees of the municipality, thereby

limiting liability to action for which the municipality is actually responsible. *Id*.

      In finding municipal liability pursuant to § 1983, the plaintiff must identify the policy,

custom or practice of the municipal defendant that results in the constitutional violation.  *Id*. at

690-91.  A municipal policy is made when a decision-maker issues an official proclamation or

decision. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986), *quoted in*, *Andrews v. City of*

*Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990).  A custom or practice, however, may consist

of a course of conduct so permanent and widespread that it has the force of law.  *Andrews*, 895

F.2d at 1480.  To establish municipal liability based upon a custom or practice, the plaintiff must

demonstrate that the decision-maker had notice that a constitutional violation could occur and

that the decision-maker acted with deliberate indifference to this risk. *Berg v. County of*

*Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000).  Finally, Plaintiff must show a causal connection

between the custom or policy and the violation of the constitutional right. *Bielevicz v. Dubinon*,

915 F.2d 845, 850-51 (3d Cir. 1990).  That is, a plaintiff must demonstrate an "affirmative link"

or "plausible nexus" between the custom or practice and the alleged constitutional deprivation.

*Bielevicz*, 915 F.2d at 850-51.

31

Municipal liability can be predicated upon a failure to train.  To establish liability on a failure to train theory, a plaintiff must set forth specific allegations that the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference.  *Brown v. Muhlenberg Township*, 269 F.3d 205, 216 (3d Cir. 2001) (citing *City of Canton*, 489 U.S. 378, 390 (1989)).

In the Amended Complaint, Plaintiffs appear to suggest that the policies and/or customs at issue here are these Washington County officials' inadequate training of W.C.C.Y.S.'s staff.  (Amended Complaint at ¶ 42.)  Yet, the Amended Complaint contains no facts indicating what the official policy is.  Likewise, if Plaintiffs do not rely on the existence of an official policy as the cause of Plaintiffs' alleged constitutional violations, Plaintiffs aver no facts suggesting the existence of a custom or practice so permanent and widespread, that it had the force of official policy.  *See Andrews*, 895 F.2d at 1480.  If pursuing a custom or practice theory, Plaintiffs allege no facts that a Defendant decision-maker had notice that the alleged constitutional violation could occur and that this decision-maker acted with deliberate indifference to this known risk.  *See Berg*, 219 F.3d at 276.  In addition, Plaintiffs allege no facts that describe the need for more or different training, that this need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the Washington County officials' failure to provide it amounted to deliberate indifference.  Accepting all well-pleaded facts in the Amended Complaint as true and giving the *pro se* Plaintiffs every benefit of the doubt, the averments of the Amended Complaint fail to satisfy the requirements of *Twombly* and its progeny; and fail to show that the Plaintiffs have a "plausible" claim.  Consequently, Plaintiffs' claims against Defendants Washington County Commissioners Lawrence Maggi, Diana Irey, J. Bracken Burns,

and Washington County Controller Michael Namie should be dismissed with prejudice.  The substance of Plaintiffs' voluminous Amended Complaint demonstrates that any attempt by Plaintiffs to amend as to these Defendants would be futile.[17]

        b.      <u>Washington County Sheriff Samuel Romano</u>

Defendants argue that the allegation against Washington County Sheriff Samuel Romano must be dismissed.  As noted above, Plaintiff Father avers that his constitutional rights were violated when the Sheriff's office did not return him to SCI Mahanoy during the months of August through September 2007, in violation of three state court orders by Washington County Court of Common Pleas Senior Judge, John F. Bell, Criminal Division.  (Amended Complaint at ¶ 56.)  Plaintiff Father further avers that he was held by the Washington County Sheriff for two civil hearings and then for no reason afterward, although Plaintiff Father suggests that he had a criminal appearance scheduled in the future.  (*Id.* at ¶ 56.)  Defendants contend that even if these allegations are true, they do not constitute a constitutional claim, but are in fact matters for the state court to review.  (Doc. No. 109 at 11.)  Plaintiff Father responds that the Washington County Sheriff's office violated his due process rights, and that more information about how the Sheriff and others conspired to violate his rights will be forthcoming in discovery.  Plaintiff Father concludes that his complaint is adequate pursuant to "notice pleading" requirements.

Plaintiff Father's claim against Washington County Sheriff Samuel Romano should be dismissed with prejudice.  Pursuant to the requirements of *Twombly* and its progeny, Plaintiff

---

[17]The Court of Appeals in *Phillips v. County of Allegheny* has ruled that if a district court is dismissing a claim pursuant to 12(b)(6) in a civil rights case, it must *sua sponte* "permit a curative amendment unless such an amendment would be inequitable or futile." 515 F.3d 224, 245 (3d Cir.2008).

Father has failed to plead a plausible claim for relief. Father has no constitutional right to be housed in any particular penal institution. *Meachum v. Fano*, 427 U.S. 215, 224 (1976) (holding that a valid conviction "empower[s] the State to confine [an inmate] in any of its prisons"). Likewise, transfers from one institution to another do not implicate constitutional rights, regardless of whether the transfer is the result of an inmate's misbehavior or is punitive in nature. *Montayne v. Haymes*, 427 U.S. 236, 242 (1976). In *Meachum,* the United States Supreme Court specifically discussed a prison inmate's due process rights in this context:

> [W]e cannot agree that *any* change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause. The Due Process Clause by its own force forbids the State from convicting any person of crime and depriving him of his liberty without complying fully with the requirements of the Clause. But given a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution. The Constitution does not require that the State have more than one prison for convicted felons; nor does it guarantee that the convicted prisoner will be placed in any particular prison, if, as is likely, the State has more than one correctional institution. The initial decision to assign the convict to a particular institution is not subject to audit under the Due Process Clause, although the degree of confinement in one prison may be quite different from that in another. The conviction has sufficiently extinguished the defendant's liberty interest to empower the State to confine him in *any* of its prisons.
>
> Neither, in our view, does the Due Process Clause in and of itself protect a duly convicted prisoner against transfer from one institution to another within the state prison system.

427 U.S. at 224-25 (emphasis in original). Consequently, Plaintiffs' claim against Washington County Sheriff Samuel Romano should be dismissed with prejudice. Any attempt to amend this claim would be futile.

        c.    <u>Washington County Correctional Facility Warden</u>

Defendant W.C.C.F. Warden argues that Father's claim that a correctional officer threatened him with bodily harm unless he stopped writing letters and filing lawsuits (Doc. No. 36 at ¶ 89) must be dismissed because "verbal harassment or threats, standing alone, do not state a constitutional violation."  (Doc. No. 109 at 12.)

Defendant Warden is correct that the law is clear that "'allegations of threats or verbal harassment, without injury or damage, do not state a claim under 42 U.S.C. § 1983.'" *Burkholder v. Newton,* 116 Fed. Appx. 358, 360 (3d Cir. 2004) (quoting *Ramirez v. Holmes,* 921 F. Supp. 204, 210 (S.D.N.Y. 1996) and citing *Patton v. Przybylski,* 822 F.2d 697 (7th Cir. 1987) (holding that mere derogatory remarks do not make out a constitutional violation); *Ivey v. Wilson,* 832 F.2d 950, 955 (6th Cir. 1987) (explaining that verbal threats will not violate the Fourteenth Amendment unless accompanied by physical force or a present ability to effectuate them); *Gaut v. Sunn,* 810 F.2d 923, 925 (9th Cir. 1987) (ruling that "it trivializes the eighth amendment to believe a threat constitutes a constitutional wrong")).  Moreover, as also argued by Defendant Warden, he cannot be liable in *respondeat superior* for the actions of a corrections officer unless Plaintiff Father can show a specific supervisory practice or procedure that Defendant Warden failed to employ, that the existing custom or practice without that specific practice or procedure created an unreasonable risk of harm, that Defendant Warden was aware that this unreasonable risk existed, that Defendant Warden was indifferent to that risk, and that Father's harm resulted from Defendant Warden's failure to employ that supervisory practice or procedure.  *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989).  As to causation, Father must aver facts as to what Defendant Warden failed to do that shows he acted with deliberate indifference.  "Only in the context of a specific defalcation on the part of the supervisory official can the court assess

whether the official's conduct evidenced deliberate indifference and whether there is a close causal relationship between the 'identified deficiency' and the 'ultimate injury.'" *Sample*, 885 F.2d at 1118.  Plaintiff Father's Amended Complaint contains no facts to suggest a claim of supervisory liability.  Finally, because Father's attempt to make out a claim against the corrections officer for threats of bodily harm must necessarily fail, any efforts to amend the complaint to include a claim for supervisory liability against Defendant Warden regarding these threats will be futile.  *See City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) (holding that the threshold requirement for municipal or supervisory liability is an underlying constitutional violation by an employee).  Consequently, Father's claim for threats against Defendant Warden must be dismissed with prejudice.

Next, Defendant Warden argues that Plaintiff Father's claim for violation of his First Amendment right to freely exercise his religion (Doc. No. 36 at ¶ 54) is moot because he is no longer housed at W.C.C.F.  Defendant's argument is meritorious only as to Father's claims for injunctive and declaratory relief.  *Sutton v. Rasheed,* 323 F.3d 236, 248 (3d Cir. 2003) (inmate's transfer or release from facility complained of generally moots equitable and declaratory claims).  Father's claim for monetary damages, however, remains despite his transfer out of the W.C.C.F.  *Id.* at 249.

In Paragraph 54 of the Amended Complaint, Plaintiff Father avers only that he was not provided with a "spiritual representative to counsel plaintiff" while in administrative custody at the W.C.C.F., and that "no church services were offered at anytime."  (Doc. No. 36 at ¶ 54.)  Defendants have not moved to dismiss Plaintiff Father's First Amendment Free Exercise claim as it relates to monetary damages.  The Court, however, pursuant to the PLRA, will examine this

claim, *sua sponte.*

The United States Supreme Court has recognized that the First Amendment guarantees that all prisoners must be afforded reasonable opportunities to exercise their religious freedom. *Cruz v. Beto,* 405 U.S. 319, 322 n.2 (1972).  In order to state a violation of the right to exercise one's religion, a plaintiff must allege a "substantial burden" on the exercise.  *See, e.g., Thomas v. Review Bd.,* 450 U.S. 707, 718 (1981); *Wisconsin v. Yoder,*406 U.S. 205, 218 (1972).  *See also Williams v. Sweeney,* 882 F. Supp. 1520, 1523 (E.D. Pa. 1995); *Madison v. Horn,* 1998 WL 531830, at *8 (E.D. Pa. Aug. 21, 1998).  With respect to prisoners, however, the inquiry does not end there.

Although inmates retain certain protections afforded by the First Amendment, "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (quotations omitted).  In *Shabazz*, the Supreme Court determined that prison regulations alleged to infringe upon an inmate's "religious" rights under the First Amendment must be reviewed under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights.  *Id*.  In so concluding, the Court held that when a prison regulation impinges on inmates' constitutional rights "the regulation is valid if it is reasonably related to legitimate penological interests."  *Id*. at 349.  In determining whether the regulation was "reasonably related," the Court employed the four-factor test that it developed in *Turner v. Safley*, 482 U.S. 78, 89 (1987), namely:  1) whether there is a rational connection between the regulation and the penological interest asserted; 2) whether inmates have an alternative means of exercising their rights; 3) what impact

accommodation of the right will have on guards, other inmates and the allocation of prison resources, and 4) whether alternative methods for accommodation exist at *de minimis* cost to the penological interest asserted.

In the instant action, Father has failed to allege how his inability to access a spiritual advisor and attend church services substantially impacted his ability to exercise a central tenet of his religion[18]. His conclusory averments do not rise to the level of an allegation of "substantial burden." Consequently, Plaintiff Father must be given an opportunity to amend his complaint.

Likewise, Defendant W.C.C.F. has not moved to dismiss Plaintiff Father's other conditions of confinement claims in Paragraphs 54 and 83 of the Amended Complaint. Pursuant to the provisions of the PLRA, the Court will also consider these claims *sua sponte*.

1. Access to legal materials including photo copies, paper and envelopes

The right of access to the courts is guaranteed by the First Amendment of the United States Constitution. In *Bounds v. Smith*, 430 U.S. 817 (1977), the United States Supreme Court held "that the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id*. at 828. In *Lewis v. Casey*, 518 U.S. 343 (1996), the Supreme Court effectively repudiated much of its prior holding in *Bounds*. In *Lewis*, the Supreme Court held that *Bounds* did not recognize an independent right in prisoners to have an adequate law library; instead, it concerned the established right of access to the courts. *Lewis* 518 U.S. at 351. Thus, the *Lewis* Court held that,

---

[18]Father does not identify the religion he wishes to practice.

in order to successfully challenge a denial of this right of access to the courts, it is not enough for an inmate to establish that the law library provided was inadequate or he was denied access either to the law library or to legal materials; rather, he must establish that such inadequacies in the library or in accessing legal materials caused him actual harm.

In *Christopher v. Harbury*, 536  U.S. 403 (2002), the Supreme Court set forth specific criteria that a court must consider in determining whether a plaintiff has alleged a viable claim of right of access to the courts.  Specifically, the Supreme Court held that, in order to state a claim for denial of access to courts, a party must identify all of the following in the complaint:  1) a non-frivolous, underlying claim: 2) the official acts frustrating the litigation; and 3) a remedy that may be awarded as recompense but that is not otherwise available in a future suit.  *Christopher*, 536 U.S. at 415.

The Court explained that the first requirement mandated that the plaintiff specifically state in the complaint the underlying claim in accordance with the requirements of Rule 8(a) of the Federal Rules of Civil Procedure to the same degree as if the underlying claim was being pursued independently.  *Christopher*, 536 U.S. at 417.  In this regard, the statement must be sufficiently specific to ensure that the district court can ascertain that the claim is not frivolous and that the "the 'arguable' nature of the underlying claim is more than hope."  *Id*.  The second requirement requires a Plaintiff to clearly allege in the Complaint the official acts that frustrated the underlying litigation.  Third, a Plaintiff must specifically identify a remedy that may be awarded as recompense in a denial-of-access case that would not be available in any other future litigation.  *Id*. at 414.

Here, Plaintiff has failed to identify any legal action he was unable to pursue.  In fact,

Plaintiff Father's impassioned  participation in the state court action in Washington County as evidenced by the docket sheet demonstrates that his access to the courts has not been hampered. In addition, Plaintiff Father has failed to allege facts describing the official acts that frustrated his efforts to pursue the underlying litigation[19].  Nor has he alleged a remedy that may be awarded as recompense but that is not otherwise available in a future suit.  Thus, Plaintiff's claim for denial of access to the courts should be dismissed with prejudice.  Any amendment would most certainly be futile.

2.      Denial of any Communication between Plaintiff Father and his
        Family

In Paragraph 54 of the Amended Complaint, Plaintiff Father avers that Defendant stopped communication between Plaintiff and his family including the denial of outgoing phone calls and personal mail, and censoring personal mail.

Plaintiff's claims concern Defendant's alleged censorship of both his incoming and outgoing mail.  Under Supreme Court precedent, these two types of activities are analyzed differently.  In *Procunier v. Martinez*, 416 U.S. 396 (1974), the court reviewed a state's procedures for censoring inmates' outgoing correspondence.  In its review, the Court was concerned with the fact that censorship of prisoners' outgoing mail affected the First and Fourteenth Amendment rights of the addressee as well as the sender of the correspondence.  In light of that recognition, the Court held that censorship of outgoing prisoner mail is justified

_____

[19]Nor has Plaintiff identified the individuals who personally participated in the alleged denial of this constitutional right, or the theory of municipal liability to support this claim against the Warden.

when:  1) the regulation or practice furthers an important or substantial governmental interest

unrelated to the suppression of expression; and 2) the limitation is no greater than is necessary or

essential to the protection of the particular governmental interest involved.  *Martinez*, 416 U.S. at

413.

In addition, the Court held that "the interest of prisoners and their correspondents in

uncensored communication by letter, grounded as it is in the First Amendment, is plainly a

'liberty' interest within the meaning of the Fourteenth Amendment even though qualified of

necessity by the circumstance of imprisonment."  *Id*. at 418.  As such, the Court required that "an

inmate be notified of the rejection of a letter written by or addressed to him, that the author of

that letter be given a reasonable opportunity to protest that decision, and that complaints be

referred to a prison official other than the person who originally disapproved the

correspondence."  *Id*. at 418-19.  Later, in *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989), the

Court limited the holding in *Martinez* as applicable only to regulations concerning outgoing

correspondence.

Here, Plaintiff Father's allegation concerning these issues is so brief that amendment is

necessary to understand the nature of Father's claims, and Defendant W.C.C.F.'s response

thereto.  Consequently, Plaintiff Father should be given an opportunity to amend his complaint as

to this claim.

3. <u>Censorship of legal mail</u>

Plaintiff also avers in Paragraph 54 of the Amended Complaint that Defendant W.C.C.F.

"read all incoming and outgoing legal mail and delivered legal mail to Plaintiff opened . . ." so as

to learn of "confidential legal matters and strategies between client and lawyer."

In *Jones v. Brown,* the United States Court of Appeals for the Third Circuit held that a blanket practice of opening inmate legal mail outside the presence of the inmate implicates First Amendment concerns.  461 F.3d 353, 359 (3d Cir. 2006).  Consequently, Plaintiff should be granted leave to amend the complaint to aver additional facts including, but not limited to whether Defendant W.C.C.F. had established procedures regarding legal mail (i.e. attorney control numbers), and  whether Plaintiff complied with any established procedures.  *See e.g., Fontroy v. Beard,* 559 F.3d 173 (3d Cir. 2009) (state prison policy requiring control numbers on legal and court mail sent to inmates, and opening mail without control numbers outside inmate's presence did not violate First Amendment).

4.      Retaliation for complaining/ filing legal paperwork

Plaintiff Father avers in Paragraph 54 of the Amended Complaint that Defendant W.C.C.F. used administrative custody as a tool to retaliate against Plaintiff for complaining and filing legal paperwork against Defendant.  (Doc. No. 36 at ¶ 54.)

It is well settled that retaliation for the exercise of a constitutionally protected right is itself a violation of rights secured by the Constitution, which is actionable under § 1983.  *Rauser v. Horn*, 241 F.3d 330 (3d Cir. 2001); *White v. Napoleon*, 897 F.2d 103, 112 (3d Cir. 1990).  Merely alleging the fact of retaliation, however, is insufficient.  In order to state a claim for retaliation claim, a plaintiff must allege the following:  (1) the conduct which led to the alleged retaliation was constitutionally protected; (2) that he was subjected to adverse actions by a state actor (here, the prison officials); and (3) the protected activity was a substantial motivating factor

in the state actor's decision to take the adverse action.  *See Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Anderson v. Davila*, 125 F.3d 148, 163 (3d Cir. 1997).

A plaintiff can satisfy the second requirement by demonstrating that the "adverse" action "was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." *See Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000).  The third factor, "motivation," may be established by alleging a chronology of events from which retaliation plausibly may be inferred. *Tighe v. Wall*, 100 F.3d 41, 42 (5th Cir. 1996); *Goff v. Burton*, 91 F.3d 1188 (8th Cir. 1996); *Pride v. Peters*, 72 F.3d 132 (Table), 1995 WL 746190 (7th Cir. 1995).

If the plaintiff proves these three elements, the burden shifts to the state actor to prove that it would have taken the same action without the unconstitutional factors.  *Mt. Healthy*, 429 U.S. at 287.  "This means that, once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest."  *Rauser,* 241 F.3d at 334.  Because retaliation claims can be easily fabricated, district courts must view prisoners' retaliation claims with sufficient skepticism to avoid becoming entangled in every disciplinary action taken against a prisoner.  *See Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996); *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995); *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

A prisoner's ability to file grievances and lawsuits against prison officials is a protected activity for purposes of a retaliation claim.  *See Milhouse v. Carlson*, 652 F.2d 371, 373-74 (3d Cir. 1981) (retaliation for exercising right to petition for redress of grievances states a cause of

action for damages arising under the constitution); *Woods*, 60 F.3d at 1165 (prison officials may not retaliate against an inmate for complaining about a guard's misconduct). Thus, Plaintiff appears to have alleged the first element of a retaliation claim, although more detailed facts are needed as to the nature and timing of his complaints and filing of legal papers. With respect to the second element, Plaintiff alleges that he was placed in administrative custody. Thus, it appears that Plaintiff arguably was subjected to "adverse" action. *See Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2002) (holding that prisoner's allegation that he was falsely charged with misconduct in retaliation for filing complaints against a correctional officer sufficiently alleged a retaliation claim); *Allah*, 229 F.3d at 225 (holding that an allegation that a prisoner was kept in administrative segregation to punish him for filing civil rights complaints stated a retaliation claim).

The third element of a retaliation claim requires a plaintiff to demonstrate that the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action. This "motivation" factor may be established by alleging a chronology of events from which retaliation plausibly may be inferred. *Tighe v. Wall*, 100 F.3d 41, 42 (5th Cir. 1996); *Goff v. Burton*, 91 F.3d 1188 (8th Cir. 1996); *Pride v. Peters*, 72 F.3d 132 (Table), 1995 WL 746190 (7th Cir. 1995). Here, Plaintiff Father must be given an opportunity to amend his complaint detailing the sequence of events that eventually resulted in his administrative custody status. The Amended Complaint is unclear as to when Plaintiff was placed in administrative custody, and the reasons given by Defendant. Consequently, Plaintiff Father must be given an opportunity to amend his retaliation claim.

5.     Denial of adequate medical care

At Paragraph 83, Plaintiff Father avers that Defendant did not provide adequate medical care, and that as a result, he suffered unnecessary infliction of pain.  Plaintiff further avers that he did inform officers of Defendant W.C.C.F. of his pain, and they responded that they were unable to assist him due to budgetary constraints.  Plaintiff continues that he made verbal and written "sick call requests" but he received no response.  Finally, Plaintiff avers that he experienced an obvious weight loss due to the deterioration of his physical and mental health, that was ignored and ridiculed by prison officials.  (Doc. No. 36 at ¶ 83.)

In *Estelle v. Gamble*, the United States Supreme Court noted that the most elementary principles underlying Eighth Amendment constitutional jurisprudence "establish the government's obligation to provide medical care for those whom it is punishing by incarceration." 429 U.S. 97, 103 (1976).  The *Estelle* Court concluded that the Eighth Amendment prohibits the deliberate indifference to serious medical needs of prisoners.  *Id.* at 104.  The Court continued that a cause of action under § 1983 is thereby established "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104-05 (footnotes omitted).

It was not until 1994, however, in *Farmer v. Brennan*, that the United States Supreme Court clarified its meaning of the term "deliberate indifference." 511 U.S. 825 (1994).  In *Farmer*, the Court held as follows:

> We hold instead that a prison official cannot be found liable under the Eighth Amendment . . . unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he

> must also draw the inference. . . .  But an official's failure to alleviate a significant
> risk that he should have perceived but did not, while no cause for commendation,
> cannot under our cases be condemned as the infliction of punishment.

*Id*. at 837-38.  The *Farmer* Court also discussed its reasoning in *Estelle*, noting that negligence in

diagnosing or treating the medical conditions of prisoners will not rise to the level of an Eighth

Amendment violation.  *Farmer*, 511 U.S. at 835 (quoting *Estelle*, 429 U.S. at 106).

Conversely, a plaintiff must also demonstrate a medical need that is objectively

"sufficiently serious."  A medical need is "serious" if it is one that has been diagnosed by a

physician as mandating treatment, or one that is so obvious that even a lay person easily would

recognize the necessity for a doctor's attention.  *Monmouth County Correctional Institutional

Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988).

Father has failed to sufficiently allege an Eighth Amendment claim for denial of adequate

medical care in its particulars, including the identity of the individuals who actually participated

in the alleged constitutional violation.  Moreover, he has failed to allege whether Defendant

W.C.C.F. can be held liable under some municipal liability theory.  Consequently, Plaintiff

Father must be given an opportunity to amend his complaint.

6.   W.C.C.F. allowed Savko to have sex and become pregnant with
     D.G. while Savko was in its custody

In Paragraph 61-62 of the Amended Complaint, Father avers that Defendant W.C.C.F.

allowed Gina Savko to become pregnant with D.G. while in its custody and care, in violation of

its own policies and procedures.

The United States Supreme Court has stated that "Artcle III, of course, gives the federal

courts jurisdiction over only 'cases and controversies,' and the doctrine of standing serves to

identify those disputes which are appropriately resolved through the judicial process." *Whitmore v. Arkansas,* 495 U.S. 149, 154-55 (1990).  The *Whitmore* Court distilled the elements of standing from its prior decisions, and set forth the following elements in establishing an Article III case or controversy: 1) a litigant must establish an "injury in fact;" that is, one that is "distinct and palpable" to the complainant himself; 2) the litigant must show that the injury "fairly can be traced to the challenged action;" and 3) the injury "is likely to be redressed by a favorable decision." *Whitmore,* 495 U.S. at 155 (internal citations omitted).

Clearly, Plaintiff Father cannot meet the "injury" requirement with regard to this claim relating to Savko because the averments fail to describe an injury in fact to Plaintiff himself. Therefore, this claim involving Savko should be dismissed with prejudice.  Any amendment would be futile.

> d.    Washington County Deputy District Attorney Michael Lucas and
>        Washington County District Attorney John Pettit

Defendant Deputy District Attorney Michael Lucas moves to dismiss Plaintiff Father's claims that he allegedly withheld exculpatory evidence during the criminal prosecution that resulted in Plaintiff Father's current incarceration.  (Doc. No. 109 at 13.)  Defendant Lucas also moves to dismiss Plaintiff Father's claim that he failed to prosecute two private criminal complaints Plaintiff filed against Savko.[20]  (Doc. No. 109 at 13-14.)

Defendant District Attorney John Pettit moves to dismiss Plaintiff Father's claims

---

[20]The Amended Complaint is unclear as to whether this claim is directed to Deputy District Attorney Michael Lucas or to District Attorney John Pettit.  (Amended Complaint at ¶ 86.)  The Court's analysis is equally applicable to both Defendants.

because he alleges no facts showing how Pettit played any role in allegedly violating Plaintiff's constitutional rights, or played any role in the events about which Plaintiff Father complains. Further, argues Defendant Pettit, Plaintiff Father fails to allege that Defendant, in his policymaking capacity, enacted policies that violated Plaintiff's rights.

In *Imbler v. Pachtman*, the United States Supreme Court held that "in initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." 424 U.S. 409, 431 (1976). In order for absolute immunity to apply, the prosecutor's conduct during the initiation and presentation of the State's case must be "an integral part of the judicial process." *Id.* at 430 (quoting *Imbler v. Pachtman*, 500 F.2d 1301, 1302 (9th Cir. 1974)). The United States Supreme Court has reaffirmed that "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). A court must engage in a functional analysis to determine whether the conduct of a prosecutor falls within this "quasi-judicial" role. *Kulwicki v. Dawson*, 969 F.2d 1454, 1463 (3d Cir. 1992). The United States Court of Appeals for the Third Circuit has noted that the law "is well settled that prosecutors are entitled to absolute immunity from claims based on their failure to disclose exculpatory evidence, so long as they did so while functioning in their prosecutorial capacity." *Yarris v. County of Delaware*, 465 F.3d 129, 137 (3d Cir. 2006). Hence, Defendant Lucas' Motion to Dismiss Plaintiff Father's claim that Lucas withheld exculpatory evidence should be granted.

Similarly, many of the United States Courts of Appeals are in agreement in holding that prosecutors are absolutely immune from suit for the decision not to prosecute. *See Nedab v.*

*Litten,* No. 05-cv-5058, 2006 WL 1674254 at *1 (3d Cir. June 19, 2006); *Foster v. PHRC*; No. 05-cv-1102, 2005 WL 2891368 at *2 (3d Cir. Nov. 3, 2005); *Steele v. City of Bemidji*, 257 F.3d 902, 906 (8th Cir. 2001); *Roe c. City and County of San Francisco*, 109 F.3d 578, 583 (9th Cir. 1997); *Ross Yordy Constr. Co. v. Naylor*, 55 F.3d 285, 287 (7th Cir. 1995); *Harrington v. Almy*, 977 F.2d 37, 40 (1st Cir. 1992); *Oliver v. Collins*, 904 F.2d 278, 281 (5th Cir. 1990); *Schloss v. Bouse*, 876 F.2d 287, 290 (2d Cir. 1989); *Meade v. Grubbs*, 841 F.2d 1512, 1530 (10th Cir. 1988).  Therefore, Defendant Lucas' Motion to Dismiss Plaintiff Father's claim that Lucas failed to prosecute two private criminal complaints Plaintiff filed against Savko should be granted.

Likewise, Washington County District Attorney John Pettit's motion to dismiss should be granted as Plaintiffs have failed to indicate what involvement he had in the events and circumstances surrounding Plaintiffs' alleged constitutional violations.  *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (defendants in § 1983 action must have been personally involved in alleged wrongs; liability may not be premised upon *respondeat superior).* Further, Plaintiffs fail to allege a claim for municipal liability against the Washington County District Attorney's Office.  *See* discussion *supra.*  Consequently, Defendant Pettit's motion to dismiss should be granted.  Plaintiffs have failed to state a plausible claim for relief, and any attempt to amend would be futile in light of the substance of the voluminous averments already set forth in the amended complaint.

    e.    <u>Prothonotary of Washington County Phyllis Ranko Matheny and Washington County Clerk of Courts Barbara Gibbs</u>

Defendants Washington County Prothonotary Matheny and Washington County Clerk of

Courts Gibbs argue that although Plaintiff Father alleges that persons in the "Prothonotary's office and Clerk of Court's offices intentionally destroyed some of his filings and backdated and/or otherwise manipulated others to his detriment, . . . he does not allege how Matheny or Gibbs participated or acquiesced in this conduct. (Doc. No. 109 at 14.) As noted above, Plaintiffs have failed to identify how these individuals were personally involved in the alleged wrongs. *See Rode,* 845 F.2d at 1207 (defendants in§ 1983 action must have been personally involved in alleged wrongs; liability may not be premised upon *respondeat superior).* In addition, Plaintiffs have failed to allege a claim for municipal liability against the Washington County Prothonotary's Office and the Clerk of Courts. *See* discussion *supra.* Moreover, Plaintiffs allegations at Paragraph 88 of the Amended Complaint fail to satisfy the requirements of *Twombly* and its progeny and raise Plaintiffs' claim for relief against these Defendants above the speculative level. Therefore, the Motion to Dismiss filed by Defendants Matheny and Gibbs should be granted. Any attempt to amend would be futile.

       f.     <u>Sections 1983, 1985(3), and 1986 conspiracy claims</u>

Defendants have not moved to dismiss the various conspiracy claims that Plaintiff attempts to aver. The Court, however, pursuant to 28 U.S.C. § 1915A of the PLRA, considers these claims *sua sponte.*

Plaintiff has failed to sufficiently allege a conspiracy claim pursuant to the requirements of *Twombly* and its progeny. In order to make out a claim for conspiracy pursuant to 42 U.S.C. § 1983, a plaintiff must allege conspiracy with particularity even though a heightened pleading standard generally does not apply to civil rights actions against individual defendants. *Bieros v.*

*Nicola*, 860 F. Supp. 223, 225 (E.D. Pa. 1994) (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993)).  A complaint alleging a conspiracy must make "factual allegations of combination, agreement, or understanding among all or between any of the defendants [or coconspirators] to plot, plan, or conspire to carry out the alleged chain of events." *Spencer v. Steinman*, 968 F. Supp. 1011, 1020 (E.D. Pa. 1997).  *See also Loftus v. Southeastern Pa. Transp. Auth.*, 843 F. Supp. 981, 987 (E.D. Pa. 1994) ("While the pleading standard under [FED. R. CIV. P.] Rule 8 is a liberal one, mere incantation of the words 'conspiracy' or 'acted in concert' does not talismanically satisfy the Rule's requirements").

In the instant action, Plaintiffs have failed to allege any facts showing an agreement or plan formulated and executed by any of the Defendants to achieve a conspiracy.  Absent allegations showing any agreement to deny Plaintiffs' rights, Plaintiffs' bald allegations of conspiracy are insufficient to state a claim upon which relief can be granted.  *See, e.g.*, *Swanson v. Miller*, 55 Fed. Appx. 871 (10th Cir. 2003) (upholding dismissal of plaintiff's conclusory allegations of conspiracy as insufficient to state a claim for relief); *Tahfs v. Proctor*, 316 F.3d 584 (6th Cir. 2003).  Consequently, Plaintiffs' claims of conspiracy pursuant to 42 U.S.C. § 1983 should be dismissed with prejudice.  Any attempt to amend would be futile.

As to the remaining conditions of confinement claims against Defendant W.C.C.F., Plaintiffs have attempted to assert liability for conspiracy against this Defendant in allowing Savko to have sex and become pregnant with D.G. while Savko was in custody and that W.C.C.F. conspired with Westmoreland and Allegheny counties to conceal these facts.  (Doc. No. 36 at ¶¶ 61-61.)  As discussed *supra*, Plaintiffs have no standing to bring this claim concerning Savko's pregnancy and their § 1983 claim for conspiracy against W.C.C.F.

51

necessarily fails.  Consequently, Plaintiffs' claims for conspiracy pursuant to 42 U.S.C. § 1983 must be dismissed with prejudice as any amendment would prove futile.

Section 1985(3) establishes a cause of action against any person who enters into a private conspiracy for the purpose of depriving an individual of the equal protection of the laws.  *Rogin v. Bensalem Township.*, 616 F.2d 680, 696 (3d Cir. 1980), *cert. denied*, 450 U.S. 1029 (1981). The provisions of the statute encompass private conspiracies as well as actions under color of state law.  *Griffin v. Breckenridge,* 403 U.S.88, 101 (1971).  In order to state a claim under § 1985(3), the Plaintiff must allege four elements:  1) a conspiracy; 2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; 3) an act in furtherance of the conspiracy; and 4) injury to a person or property or deprivation of any right or privilege of a citizen of the United States.  *United Brotherhood of Carpenters & Joiners Local 610 v. Scott*, 463 U.S. 825, 828-29 (1983) (citing *Griffin,* 403 U.S. at 102).  Plaintiff must set forth specific factual allegations that demonstrate collusion or concerted action among the alleged conspirators.  *Parkway Garage, Inc. v. City of Philadelphia*, 5 F.3d 685, 700 (3d Cir. 1993) (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150 (1970)),*abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington, Pa.,* 326 F.3d 392, 400 (3d Cir. 2003); *Young v. Kann*, 926 F.2d 1396, 1405 n.16 (3d Cir. 1991), *later proceeding, Young v. Quinlan*, 960 F.2d 351 (3d Cir. 1992), *superseded by statute,* Prison Litigation Reform Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321, *as discussed in Nyhuis v. Reno,* 204 F.3d 65 (3d Cir. 2000)  Even though the Supreme Court held in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993), that the allegations in a § 1983 complaint cannot be held to a standard of heightened

specificity, a plaintiff must allege conspiracy with some particularity.  *Bieros v. Nicola*, 860 F. Supp. 223, 225 (E.D. Pa. 1994) (citing *Leatherman,* 507 U.S. at 168).  "While the pleading standard under [Fed. R. Civ. P.] Rule 8 is a liberal one, mere incantation of the words 'conspiracy' or 'acted in concert' does not talismanically satisfy the Rule's requirements."  *Loftus v. Southeastern Pennsylvania Transportation Authority*, 843 F. Supp. 981, 987 (E.D. Pa. 1994).

Plaintiffs have failed to allege any facts that indicate that the moving Defendants entered into any agreement or plan to deprive Plaintiffs of their constitutional rights. "[M]ere conclusory allegations of deprivations of constitutional rights are insufficient to state a § 1985(3) claim." *D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364, 1377 (3d Cir. 1992) (quotation omitted).  The Court has carefully examined the voluminous allegations of the 89-paragraph amended complaint, directed to the 37 different defendants who are judges, courts, court employees, county commissioners and controllers, social workers, the mothers of Father's children, Father's former counsel, a state trooper, a prison warden, a sheriff, and state and federal prosecutors.  Disregarding all legal conclusions, and accepting all of the complaint's well pleaded facts as true, the Court must conclude that the Plaintiffs have not stated a plausible claim for relief pursuant to 42 U.S.C. § 1985(3).  *Fowler,* 578 F.3d at 210-11.  Accordingly, they has failed to state a claim upon which relief may be granted under 42 U.S.C. § 1985(3).  *United States ex rel. Simmons v. Zibilich*, 542 F.2d 259 (5th Cir. 1976) (dismissal of cause of action for damages arising out of alleged conspiracy to interfere with civil rights was proper where convict's conclusory pleadings failed to allege any facts on which to base a conspiracy charge).

With regard to 42 U.S.C. § 1986, Plaintiffs' claims pursuant to § 1986 must also be dismissed with prejudice because a § 1986 claim cannot exist without a viable § 1985 claim.

42 U.S.C. § 1986 provides in part as follows:

> Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented; and such damages may be recovered in an action on the case; and any number of persons guilty of such wrongful neglect or refusal may be joined as defendants in the action . . . .

42 U.S.C. § 1986.

Liability under 42 U.S.C. § 1986 is predicated on knowledge of a violation of 42 U.S.C. § 1985.  *Bell v. City of Milwaukee*, 746 F.2d 1250, 1256 (7th Cir. 1984).  As stated above, Plaintiff has not alleged sufficient facts to support liability under 42 U.S.C. § 1985(3).  Consequently, his claim under 42 U.S.C. § 1986 should be dismissed with prejudice.  *Accord Rouse v. Benson*, 193 F.3d 936, 943 (8th Cir. 1999) (holding that inmate's allegations did not support liability under 42 U.S.C. §§ 1985(3) or 1986 as he failed to demonstrate a meeting of the minds of the alleged conspirators).  Any attempt to amend this claim would be futile.

g.      Section 1988 claims

Likewise, Defendants have not moved to dismissed Plaintiffs' claims pursuant to 42 U.S.C. § 1988.  Pursuant to the PLRA, the Court raises this claim *sua sponte.*  Section 1988 does not create an independent cause of action for the violation of federal civil rights.  *Moor v. County of Alameda,* 411 U.S. 693, 702-03 (1973).  Therefore, Plaintiff's § 1988 claim should be

dismissed with prejudice.[21]


**II.**     **CONCLUSION**

For the reasons set forth above, the Court respectfully recommends the following:

1.  That the  Motion to Dismiss (Doc. No. 108) filed by Defendants Washington County Commissioners Lawrence O. Maggi, Diana Irey, and J. Brachen Burns, and Washington County controller Michael Namie be granted.

2.  That the Motion to Dismiss (Doc. No. 108) filed by Washington County CYS director Jeffrey Felton and CYS caseworkers Patricia Maxon, Hayley Foster, Patricia Berdine, and Nancy Gray be granted as to the claims against them for declaratory and injunctive relief, and that the claims against them for monetary relief be stayed until the conclusion of the pending state court proceedings.

3.  That the Motion to Dismiss (Doc. No. 108) filed by the Washington County Correctional Facility Warden John Doe be granted except as to Plaintiff Father's First Amendment Free Exercise claim; First Amendment claim regarding denial of outgoing communications; First Amendment claim regarding censorship of legal mail; retaliation claim; and Eighth Amendment claim regarding denial of adequate medical care.

4.  That the Motion to Dismiss (Doc. No. 108) filed by Washington County District Attorney John Pettit and Deputy District Attorney Michael Lucas, Washington County Sheriff Samuel Romano, Washington County Prothonotary Phyllis Ranko Matheny and Washington County Clerk of Courts Barbara Gibbs be granted.

---

[21]Clearly, any attempt to amend this claim would be futile.

Because Plaintiffs' claims for monetary damages against Washington County Children and Youth Services must be stayed pursuant to *Younger v. Harris*, 401 U.S. 37 (1971), the Court also recommends, in the interest of judicial economy, that the claims remaining against Washington County Correctional Facility be stayed until the conclusion of the pending state court proceedings.  The case should be administratively closed until that time.[22]  It is further recommended that Counsel for the Washington County Children and Youth Services  be ordered to notify the Court within 20 days of the conclusion of the pending state court proceedings so that the case can be reopened.

In accordance with the Magistrate Judge's Act, 28 U.S.C. § 636(b)(1)(B) and (C), and FEDERAL RULE OF CIVIL PROCEDURE 72(b)(2), and Local Rule of Court 72.D.2., the parties are allowed fourteen (14) days from the date of service to file objections to this report and recommendation.  Any party opposing the objections shall have fourteen (14) days from the date of service of objections to respond thereto.  Failure to file timely objections may constitute a waiver of any appellate rights.

---

[22]The Court notes that there are other pending motions to dismiss in the above-captioned case and that the administrative closing will terminate these motions without prejudice to refile when and if the case is reopened. The Court also acknowledges that the stay will also affect Plaintiff's claims regarding his conditions of confinement against the Washington County Correctional Facility, however, as noted in an earlier footnote, as Plaintiff decided to lump these claims in with his other, unrelated, causes of action, he will have to abide by the result. He is always free to file a separate action regarding his conditions of confinement, which is what he should have done initially.

Dated: March 1, 2010                          BY THE COURT:


                                              __s/Lisa Pupo Lenihan_____
                                              LISA PUPO LENIHAN
                                              United States Magistrate Judge


          All Counsel of Record
          Via Electronic Mail

          Daniel J. Goodson, III
          GW1171
          SCI Mahanoy
          301 Morea Road
          Frackville, PA 17932